```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
MORRIS ALGARIN,                        :
                                       :
               Plaintiff,              :         06 Civ. 508 (JSR)
                                       :
          -v-                          :         MEMORANDUM ORDER
                                       :
THE NEW YORK CITY DEPARTMENT OF        :
CORRECTION, MANUJA MATHER, M.D.,       :
FAOZIA BAROUCHE, M.D., CAPTAIN         :
LOPEZ, THE NEW YORK CITY HEALTH AND    :
HOSPITALS CORPORATION, ELMHURST        :
HOSPITAL, EUGENE BURKE, M.D. and       :
MIHAI IORDACHE, M.D. HOLLISWOOD        :
HOSPITAL, VLADIMIR MILSTEIN, M.D.,     :
                                       :
               Defendants.             :
---------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff Morris Algarin, an officer with the New York City Department of Correction ("DOC") who was involuntarily committed for several days at two hospitals, brings suit under 42 U.S.C. § 1983 and parallel New York State law, alleging that in connection with the commitments all the public defendants violated his rights under the due process clauses of the United States and New York State constitutions and that the two private defendants, Holliswood Hospital and its employee Dr. Milstein, violated his state law right to be free from false imprisonment. Plaintiff now moves for summary judgment in his favor on his due process claims against two of the publicly-employed defendants, Dr. Mathur and Dr. Barouche, while all defendants except Dr. Milstein cross-move for summary judgment dismissing all claims against them.[1]

---

[1] All claims against one defendant, identified simply as "Captain Lopez," were previously dismissed on consent. See

The pertinent facts, either undisputed, or, where disputed, taken most favorably to plaintiff,[2] are as follows. In September 2004, Algarin experienced a "confusing" episode at work in which he imagined that he heard the voice of his captain telling him he was fired. Holliswood's Statement of Facts to Which There Does Not Exist a Genuine Issue Pursuant to L. Civ. R. 56.1 ("Holliswood St.") ¶ 16; Plaintiff's Response to Holliswood's Rule 56.1 Statement ("Pl. St. I") ¶ 16. Plaintiff was referred for evaluation to the DOC's Health Management Division ("HMD"), where he saw Dr. Barouche and a social worker named Scott Forsmith. Holliswood St. ¶¶ 17-18; Pl. St. I ¶¶ 17-18. Following this episode, plaintiff admitted himself to South Oaks Hospital on October 21, 2004 for in-patient treatment, telling the doctors there, among other things, that he had recently been seeing people covered in blood who were commanding him to join them. Holliswood St. ¶ 19; Pl. St. I ¶ 19. At South Oaks, plaintiff was diagnosed with major depressive disorder with psychotic features and prescribed the antipsychotic drug Seroquel and the antidepressant drug Lexapro. Holliswood St. ¶¶ 21-22; Pl. St. I ¶¶ 21-22. Plaintiff was discharged from South Oaks after one week and attended a partial hospitalization program there until November 23, 2004,

---

Transcript, August 29, 2006 ("Tr."), at 5.

[2] This is the applicable standard for assessing defendants' motions. On plaintiff's motion, by contrast, the evidence, where disputed, must be taken most favorably to the relevant defendants. But as detailed below, plaintiff's summary judgment motion is deficient on any view of the facts.

during which time he continued taking his medications.  Holliswood St. ¶¶ 20, 23; Pl. St. I ¶¶ 20, 23.

On January 27, 2005, however, after plaintiff had not taken his medications for three weeks, plaintiff again reported that he was having visual hallucinations and hearing voices.  Holliswood St. ¶¶ 25, 26; Pl. St. I ¶¶ 25,26.  Later that day, Dr. Mathur evaluated plaintiff at HMD.  Holliswood St. ¶ 27; Pl. St. I ¶ 27.  Plaintiff gave Dr. Mathur a note from plaintiff's treating physician that described his illness and the medication he had been prescribed, and informed Dr. Mathur that he had not been taking the medication for three weeks.  City Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("City St.") ¶¶ 2-3; Plaintiff's Response to City Defendants' Rule 56.1 Statement ("Pl. St. II") ¶¶ 2-3.  Dr. Mathur eventually directed HMD staff to call 911 and directed Captain Lopez to restrain plaintiff so that he could be sent to the emergency room for a psychiatric evaluation.  City St. ¶ 5; Pl. St. II ¶ 5.  Police officers detained plaintiff at HMD and transported him to Elmhurst Hospital.  City St. ¶ 6; Pl. St. II ¶ 6.

Within six hours of his arrival at Elmhurst, plaintiff was examined, first by Dr. Rondon, a psychiatry resident (and not a defendant here), and then by Dr. Burke, an attending psychiatrist (and a defendant here).  City St. ¶ 7; Pl. St. II ¶ 7.  Dr. Rondon and Dr. Burke were aware that plaintiff had been hospitalized at South Oaks in October 2004 and that plaintiff had been suicidal in the past.  City St. ¶¶ 8-9; Pl. St. II ¶¶ 8-9.  Dr. Rondon determined that plaintiff had been suffering from harassment and stress at work.

3

City St. ¶ 10; Pl. St. II ¶ 10.  Dr. Rondon also noted that plaintiff appeared "stressed, angry . . . internally preoccupied," that plaintiff spoke "with his eyes closed most of the time," and that plaintiff "[r]efused to answer questions regarding delusions or hallucinations."  Declaration of Cindy E. Switzer dated July 27, 2006 ("Switzer Declaration"), Ex. C at D000016; City St. ¶ 10; Pl. St. II ¶ 10.  Dr. Burke, however, after evaluating plaintiff, meeting with plaintiff's wife, and receiving assurances that plaintiff did not have access to guns at home, discharged plaintiff to his wife's care with instructions to follow up with plaintiff's therapists.  City St. ¶ 11; Pl. St. II ¶ 11.

Subsequently, on February 7, 2005, Dr. Barouche met with plaintiff at HMD to determine whether plaintiff was fit for duty.  City St. ¶ 12; Pl. St. II ¶ 12.  According to plaintiff, during the course of the meeting, Dr. Barouche (a female) suggested that plaintiff quit his job if he could not "handle the stress," and plaintiff replied: "How would you feel if I or someone else fondled your breast and touched your buttocks and sexually harassed you and you told a supervisor and they said, 'If you can't handle it, quit.'"  Declaration of Mercedes Maldonado dated August 15, 2006, Ex. C ¶ 6.  Whatever the exchange -- compare Plaintiff's Statement of Undisputed Facts Pursuant to Fed. R. Civ. P. 56.1 ("Pl. St. III") ¶¶ 22, 25 with City Defendants' Counter Statement Pursuant to Local Rule 56.1 ("City Counter St.") ¶¶ 22, 25 -- Dr. Barouche had followed plaintiff since 1997 and had never seen him act this way before, in a manner she regarded as threatening.  Pl. St. III ¶ 28; City Counter St. ¶ 28;

4

City St. ¶ 13; Pl. St. II ¶ 13.  As a result, Dr. Barouche directed HMD staff to call 911.  City St. ¶ 15; Pl. St. II ¶ 15.  Police officers subsequently transported plaintiff to Elmhurst.  City St. ¶ 15; Pl. St. II ¶ 15.

Within six hours of plaintiff's arrival at Elmhurst, he was again examined by doctors.  City St. ¶ 16; Pl. St. II ¶ 16.  At least some of the medical staff at Elmhurst found plaintiff to be "uncooperative, very guarded and suspicious" and to exhibit mild paranoia.  City St. ¶ 17; Pl. St. II ¶ 17.  More importantly, plaintiff told the Elmhurst staff that he had experienced visual and auditory hallucinations of people covered in blood calling for him to join them (although the parties dispute whether plaintiff said he was having these hallucinations that day) and that he found these hallucinations very frightening.  City St. ¶ 18; Pl. St. II ¶ 18.

By 8:00 am the next morning, February 8, 2005, i.e., within 24 hours of plaintiff's entrance into the hospital, a Dr. Dopkin (not a defendant here) certified plaintiff's emergency admission to Elmhurst pursuant to New York's Mental Hygiene Law ("MHL") § 9.40, which provides for emergency observation, care and treatment in a comprehensive psychiatric emergency program ("CPEP").  Holliswood St. ¶ 45; Pl. St. ¶ 45.  During the day, Dr. Dopkin and Dr. Iordache (a defendant here) reevaluated plaintiff and certified him for involuntary admission pursuant to MHL § 9.27, and the Deputy Director of Elmhurst, Dr. Barron (not a defendant here), later approved this certification.  Holliswood St. ¶ 45; Pl. St. ¶ 45.  Dr. Iordache, on his certification for involuntary commitment, described plaintiff as

5

having a "history of psychosis, now very labile, irritable, guarded, paranoid ideation, intermittent visual and auditory hallucinations of people covered in blood calling to go to them, threatening to hurt self and others." Switzer Declaration Ex. C at D000040.  Similarly, Dr. Dopkin, on his certification, described plaintiff as "labile paranoid threatening with intermittent auditory + visual hallucinations / menacing + labile + unpredictable / Danger to others." Id. at D000042.  According to plaintiff, he openly acknowledged his past hallucinations, but did not describe himself as currently experiencing those symptoms.  Declaration of Mercedes Maldonado dated August 17, 2006, Ex. B ¶ 18.  Plaintiff notes that a psychology intern at Elmhurst described plaintiff as "alert and oriented" with "[n]o evidence of hallucinations or overt delusions" or "suicidal/homicidal ideation." Pl. St. II ¶ 17; Switzer Declaration Ex. C at D000063.  But the intern also described plaintiff as having a "euphoric" mood," a "mildly dysphoric" affect, and "mild paranoid thoughts."  Switzer Declaration Ex. C at D000063.

In any event, following Dr. Barron's certification pursuant to MHL § 9.27, plaintiff was transferred to Holliswood Hospital for in-patient treatment.  Holliswood St. ¶ 47; Pl. St. ¶ 47.  Upon his arrival at Holliswood, plaintiff was examined by a Dr. Koppel (not a defendant here), who reviewed, among other things, a copy of records and notes from Elmhurst.  Holliswood St. ¶ 48; Pl. St. ¶ 48.  Dr. Koppel accepted plaintiff for admission to Holliswood and Dr. Vladimir Milstein was assigned as plaintiff's treating psychiatrist.  Holliswood St. ¶¶ 49-50; Pl. St. ¶¶ 49-50.

6

The next day, February 9, 2005, a treatment team made up of Dr. Milstein, a social worker named Nana Asirifi, an intern named Sophia Smith, and others was assigned to plaintiff and evaluated him. Holliswood St. ¶¶ 53, 55; Pl. St. ¶¶ 53, 55.  (Of the team, only Dr. Milstein is a defendant here.)  The team discussed a treatment plan with plaintiff, which he signed, and different members of the team met with plaintiff at various times during his stay.  Holliswood ¶¶ 55-56, Pl. St. ¶¶ 55-56.  At one point, plaintiff told Nana Asirifi about his hallucinations of bloody people and of other hallucinations that interfered with his ability to sleep.  Holliswood St. ¶ 57; Pl. St. ¶ 57.

Plaintiff also kept a personal diary while at Holliswood in which, in the entry dated February 10, he described seeing "a man sitting on the chair covered in blood," which "freaked [him] out so bad" because "[i]t was so real."  Affidavit of Lori R. Semlies dated July 26, 2006 ("Semlies Affidavit"), Ex. M at 4; Holliswood St. ¶ 59; Pl. St. ¶ 59.  Plaintiff also wrote in his diary that he was concerned about a "conspiracy" because on February 9, "Dr. Milstein . . . came into my room and told me, 'Before you explain to me what brings you here, I want you to understand that Dr. B[a]rouche is actually a good friend of mine and I [have] know[n] her for many years.'"  Semlies Affidavit Ex. M at 2.  "The only message" plaintiff got from these remarks was "keep your mouth shut and you might live." Id.  Later in his diary, plaintiff summarized his time at Holliswood and wrote, with respect to February 9:  "Definitely a conspiracy. Now I'm really dead."  Id. at 5.  Plaintiff confirmed at his

7

deposition that his diary accurately reflected his time at Holliswood and confirmed that he had two hallucinations while there. See Tr. at 72-75. Holliswood discharged plaintiff on February 15, 2006 with a diagnosis of schizophrenic disorder, bipolar type, PTSD. Holliswood St. ¶ 61; Pl. St. ¶ 61.

Against this background, the Court turns first to plaintiff's motion for summary judgment against Dr. Mathur and Dr. Barouche. At oral argument on August 29, 2006, the Court denied this motion from the bench, see Tr. at 18, but a few further words are in order. Plaintiff grounds his summary judgment motion principally on the assertion that neither Dr. Mathur nor Dr. Barouche qualified as a supervising psychiatrist authorized to order involuntary confinement under § 9.55 of the MHL, or under any other section of the MHL, because neither physician was supervising plaintiff's care and Dr. Mathur was not even a psychiatrist.

However, the requirements of the MHL do not govern a due process claim, either under the federal or New York State constitutions. Rather, under both constitutions, due process permits any physician to compel the involuntary hospitalization of a person when the physician, "on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community," finds the person to be a danger to himself or to others. Rodriguez v. City of New York, 72 F.3d 1051, 1063 (2d Cir. 1995); see generally O'Connor v. Donaldson, 422 U.S. 563, 575, 580-81 (1975). Although the Second Circuit Court of Appeals has found compliance with the MHL sufficient to meet the

8

requirements of due process, see Project Release v. Prevost, 722 F.2d 960, 973-74 (2d Cir. 1983), it has never found that compliance with the MHL is a necessary condition to guaranteeing due process in such circumstances. That is because the constitutionality, vel non, of an involuntary commitment is assessed on the basis of whether a physician determines dangerousness according to standards generally accepted in the medical community and the MHL does not set those standards. Accordingly, the fact that neither Dr. Mathur nor Dr. Barouche may have met the technical requirements of the MHL does not, per se, make out a due process claim against them, and summary judgment may therefore not be granted against them on that basis.

Turning next to the motion for summary judgment made by the DOC, the New York City Health and Hospitals Corporation ("HHC"), and the individual City-employed doctors acting in their official capacities (collectively, the "City defendants"), it is well settled that such defendants may only be liable under § 1983 if their violation of plaintiff's federal rights -- here, the right not to be deprived of liberty without due process -- resulted from an official policy or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978).[3] To demonstrate such policy or custom, plaintiff must show that a defendant's unconstitutional action was taken pursuant to "'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[,] . . . [or] pursuant to governmental "custom" even though such a custom has not

---

[3] Plaintiff has withdrawn any claim of an unconstitutional policy or custom with respect to Elmhurst. See Tr. at 19.

received formal approval through the body's official decisionmaking channels.'" Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000) (quoting Monell, 436 U.S. at 690-91).

Plaintiff argues that certain statements made by Dr. Mathur, Dr. Barouche, HMD doctor Peter Theo, and HMD nurse Abigail Peterson raise a disputed issue of fact as to whether the City defendants had a policy of detaining corrections officers on the basis of findings of dangerousness made by physicians who are not authorized to make such findings under the MHL. However, as discussed above, procedural violations of the MHL do not of themselves violate due process. Rather, the City defendants would be engaging in unconstitutional activity only if they had a policy or custom of detaining correction officers either without any finding of "dangerousness" or with a finding of "dangerousness" that was made on the basis of "substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community." Rodriquez, 72 F.3d at 1063.

The testimony plaintiff cites does not raise any genuine issue of material fact suggesting the existence of either such alternative. Specifically, plaintiff cites Dr. Mathur's deposition testimony that she has referred correction officers to the hospital "once in a while" (Declaration of Mercedes Maldonado dated July 25, 2006, Ex. D at 38); Dr. Barouche's deposition testimony that, in a given year, she sends five or fewer correction officers to the "psyche [sic] emergency room for evaluation" (id. Ex. C at 80-81); Dr. Theo's deposition testimony that he has referred correction

officers to the hospital for psychiatric evaluation approximately 30 times since he was hired in 1992 when he is concerned about "dangerousness," and that he does this because "[t]hat's what we do here" and "[i]t's generally what the doctors do" (Declaration of Mercedes Maldonado dated August 15, 2006, Ex. H at 91); and Nurse Peterson's sworn statement that during her 17 years at HMD, she has seen DOC doctors refer correction officers to the hospital for psychiatric evaluation "[a] lot . . . [m]aybe five times a month" (id. Ex. G at 96).

Even in the light most favorable to plaintiff, none of these statements raise a material issue of fact as to whether the entity defendants have an unconstitutional policy or custom. The only testimony that even hints at any kind of policy or custom is Dr. Theo's, where he says "[t]hat's what we do here;" but in context, no reasonable fact-finder could infer that Dr. Theo is saying any more than that HMD customarily refers correction officers for psychiatric evaluation where a doctor is concerned about the officer's dangerousness. Nothing in Dr. Theo's deposition testimony, or in any of the other statements, suggests either that determinations of dangerousness are not made at all or that they are made on the basis of criteria that are substantially below the standards generally accepted in the medical community, Rodriguez, 72 F.3d at 1063, and plaintiff has not submitted any other evidence, as plaintiff must, of any substandard criteria that were used. Accordingly, the City defendants' motion for summary judgment dismissing plaintiff's § 1983 claims against them must be granted.

11

Dr. Mathur, Dr. Barouche, Dr. Burke, and Dr. Iordache also move for summary judgment dismissing plaintiff's § 1983 claims against them in their individual capacities. As already indicated, it is plaintiff's burden to produce competent evidence of what medical standards govern the decision to order involuntary commitment and of whether such a decision by a given individual defendant was not made in accordance with those standards. Olivier v. Robert L. Yeager Mental Health Center, 398 F.3d 183, 190 (2d Cir. 2005). In the Second Circuit, "a plaintiff ordinarily must introduce expert testimony to establish the relevant medical standards that were allegedly violated" because "a jury composed of non-experts typically cannot discern generally accepted medical standards for itself," except in the rare case where the deviation from the standard of care is obvious, such as where "a dentist has pulled the wrong tooth." Id.

Here, the only expert report plaintiff submitted –- from Robert G. Kammerman, M.D., see Switzer Declaration Ex. D ("Kammerman Report") –- is, as defendants contend, inadmissible under Rule 702 of the Federal Rules of Evidence. Moreover, even if it were admissible, it would not carry plaintiff's burden. Both these deficiencies result from the fact that the Kammerman Report never articulates, in any legally cognizable way, what are the standards of the medical community governing involuntary commitment.

It is true that in three paragraphs on the general "Importance of Assessment for Involuntary Confinement," Dr. Kammerman refers to several vague standards that he claims govern the decision

12

to commit a patient involuntarily.  Kammerman Report at 5.  But, as Dr. Kammerman makes clear at the outset of his report, his sole basis for alleging that these are the governing standards is a subjective inference he has drawn from his own personal experience.  See Kammerman Report at 2.  "An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the scientific community."  Berk v. St. Vincent's Hosp. and Med. Ctr., 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005).  See generally Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert").

Dr. Kammerman's failure to identify generally accepted standards governing involuntary commitment also undercuts his analysis of the individual defendants' performances, as he has no benchmark against which to judge the individual defendants.  Dr. Kammerman does not evaluate the individual defendants' performances according to any particular accepted methodology, cite to any pertinent medical literature, or employ any other evidence in support of his conclusion that the doctors made some bad choices.  As a result, Dr. Kammerman's report cannot be read to express any more than simply his personal disagreement with the individual defendants' treatment decisions.

At the end of his report, Dr. Kammerman opines that "[n]one of the doctors involved in using the mental health laws to confine

this plaintiff involuntarily met minimal community standards for medical practice regarding assessment for dangerousness." Kammerman Report at 16. But this conclusion is not the product of the application of any analytic method, aside from Dr. Kammerman's personal experience, and Dr. Kammerman cites no support for it, other than his occasional allusions to "common sense." Taken as a whole, his report is not based on reliable principles and methods and is not helpful to the task at hand. Accordingly, the Court finds Dr. Kammerman's report inadmissible under Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592-97 (1993) and Fed. R. Evid. 702.

Because Dr. Kammerman's report is inadmissible under Daubert and Rule 702, and because this is not one of the rare cases where a jury would be competent to evaluate the professional propriety of the individual defendants' actions without the assistance of expert testimony, plaintiff has presented no evidence that plaintiff's involuntary commitment did not meet "'standards generally accepted in the medical community.'" Olivier, 398 F.3d at 191 (quoting Rodriquez, 72 F.3d at 1063). Accordingly, defendants' motion for summary judgment on plaintiff's claims against the individual defendants is hereby granted.[4]

---

[4] Even if Dr. Kammerman's report were admissible evidence -- which it is not -- defendants would still be entitled to summary judgment on plaintiff's § 1983 claims against the individual defendants, because the individual defendants are entitled to qualified immunity. In a § 1983 action, qualified immunity shields a defendant official sued in his or her individual capacity from liability "for mistaken judgments reasonably arrived at," but not from liability "for performance that was plainly incompetent." Rodriquez, 72 F.3d at 1065 (citing Hunter v. Bryant, 502 U.S. 224, 229 (1991)). In this

14

The foregoing analysis of plaintiffs' federal claims applies with equal force to plaintiff's claims under the Due Process Clause of the New York State Constitution. The New York State Constitution's guarantee of due process is virtually coextensive with that of the U.S. Constitution. See Cent. Sav. Bank v. City of New York, 280 N.Y. 9, 10, 19 N.E.2d 659 (1939). Accordingly, the conclusion that the plaintiff's federal due process rights were not violated dictates the conclusion that plaintiff's parallel rights under the New York State Constitution were also not infringed.

Turning, finally, to the motion of defendant Holliswood for summary judgment dismissing plaintiff's claim of false imprisonment against Holliswood and Dr. Milstein,[5] Holliswood has submitted an expert affidavit from Dr. Paul Nassar concluding that the treatment given plaintiff by Holliswood and Dr. Milstein was "consistent with accepted standards of practice." Semlies Affidavit Ex. R ¶ 3. The only evidence plaintiff provides to contradict this report is, again,

---

case, "the plaintiff's evidence [of plain incompetence is] so weak, [and there is] so little factual dispute, as to permit the court to decide that question as a matter of law." Id. The only evidence plaintiff presents of the individual defendants' plain incompetence is Dr. Kammerman's report, but Dr. Kammerman's report, even if it were admissible and read in the light most favorable to plaintiff, does not even come close to suggesting that any of the individual defendants' performances were plainly incompetent. Accordingly, even if Dr. Kammerman's report were admissible, defendant's motion for summary judgment on plaintiff's § 1983 claims against the individual defendants would have to be dismissed because the individual defendants are entitled to qualified immunity.

[5] Plaintiff originally brought his false imprisonment claim against the City defendants as well but subsequently dropped this claim. See Tr. at 5.

Dr. Kammerman's report.  But Dr. Kammerman's treatment of Dr. Milstein is no more reliable than his treatment of the other individual defendants.  Dr. Kammerman simply states his personal view that "it is incumbent on [a] psychiatrist to explain the contradiction" when "faced with a sharp contradiction between what has been reported about a patient . . . and what the patient is objectively demonstrating," and that Dr. Milstein failed to make the "required" phone calls to the Elmhurst doctors when plaintiff was not demonstrating any of the dangerousness that those doctors had reported.  Kammerman Report at 16.  As with his evaluation of the other individual defendants, Dr. Kammerman does not use any reliable principle or methodology to evaluate Dr. Milstein's conduct, and his assessment of Dr. Milstein is therefore inadmissible under <u>Daubert</u> and Rule 702.

Although (perhaps by oversight) only Holliswood, and not Dr. Milstein, has moved for summary judgment on this claim, the Court may also "grant summary judgment to a non-moving party, if no genuine issues of material fact have been shown." <u>Project Release</u>, 722 F.2d at 969.  Since, as indicated, plaintiff has failed to raise any material fact as to whether either Holliswood or Dr. Milstein committed medical malpractice or otherwise violated plaintiff's rights, the Court dismisses the claim not only against Holliswood but also against Dr. Milstein.

The Court has considered plaintiff's other arguments but finds them without merit.  Accordingly, for the foregoing reasons, summary judgment is granted to defendants dismissing all of

plaintiff's claims, in their entirety, with prejudice. The Clerk is directed to close documents 35, 42, and 45, and to enter judgment in defendants' favor.

SO ORDERED.

                                                 JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        October 30, 2006